862 So.2d 705 (2003)
Lancelot Uriley ARMSTRONG, Appellant,
v.
STATE of Florida, Appellee.
Lancelot Uriley Armstrong, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC01-1874, SC02-1122.
Supreme Court of Florida.
October 30, 2003.
Rehearing Denied December 19, 2003.
*709 Terri L. Backhus, Assistant CCRC and Rachel L. Day, Assistant CCRC, Office of the Capital Collateral Regional Counsel, Fort Lauderdale, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, FL, for Appellee/Respondent.
PER CURIAM.
Lancelot Uriley Armstrong appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. Armstrong also files a petition for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm in part and reverse in part the circuit court's denial of postconviction relief, vacate the death sentence, and remand for resentencing before a new jury. We also deny the petition for writ of habeas corpus.

BACKGROUND
Armstrong was convicted of first-degree murder, attempted murder of a law enforcement officer, and armed robbery. The facts of Armstrong's crimes are more fully discussed in this Court's opinion in Armstrong v. State, 642 So.2d 730 (Fla. 1994), cert. denied, 514 U.S. 1085, 115 S.Ct. 1799, 131 L.Ed.2d 726 (1995). Briefly, they are as follows. Around two o'clock in the morning of February 17, 1990, Armstrong and another man, Michael Coleman, arrived at a Church's Fried Chicken restaurant of which Armstrong's former girlfriend, Kay Allen, was the assistant manager. Coleman and Armstrong ordered Allen to get the restaurant's money from the safe. Before doing so, she managed to activate the silent alarm. Shortly thereafter, Armstrong returned to his car while Coleman remained inside with Allen to collect the money. Due to the alarm, Deputy Sheriffs Robert Sallustio and John Greeney were dispatched to the restaurant, where they found Armstrong sitting in his vehicle. While Greeney was performing a "pat down" of Armstrong, shots were fired from the restaurant. Armstrong then retrieved his gun from the vehicle and fired at the officers. Deputy Sallustio was shot three times but survived. Deputy Greeney died instantly from close-range gunshot wounds.
The jury convicted Armstrong of the first-degree murder of Deputy Greeney, attempted murder of Deputy Sallustio, and robbery. The jury also recommended death by a nine-to-three vote. The trial court found no statutory mitigating circumstances and four aggravating circumstances: (1) Armstrong had a prior conviction for a violent felony; (2) the murder was committed while Armstrong was engaged in the commission of a robbery or flight therefrom; (3) the murder was committed for the purpose of avoiding arrest or effecting an escape from custody; and (4) Armstrong murdered a law enforcement officer engaged in the performance of his official duties. The trial court sentenced Armstrong to death for the murder conviction and to life imprisonment for the attempted murder of a law enforcement officer and armed robbery convictions.
On direct appeal, Armstrong raised twenty-four issues.[1] This Court affirmed the convictions and sentences, finding error in the improper doubling of two aggravating circumstancescommitted for the purpose of avoiding arrest and murder of a law enforcement officerbut concluded that the improper doubling was harmless *710 error beyond a reasonable doubt. Id. at 738-40.
On April 24, 2000, Armstrong filed an amended motion for postconviction relief, raising thirty-four claims.[2] The circuit court below (postconviction court) held a Huff[3] hearing, thereafter summarily denied most of Armstrong's claims, and scheduled a limited evidentiary hearing on two claims: (1) his death sentence was predicated upon a since-vacated prior felony conviction; and (2) ineffective assistance of trial counsel was rendered with regard to the investigation and presentation of mitigating evidence for the penalty phase. See State v. Armstrong, No. 90-5417CF10B (Fla. 17th Cir. Ct. order filed Jan. 2, 2001) (prehearing order). Following the evidentiary hearing, the postconviction court entered a final order denying all relief. See State v. Armstrong, No. 90-5417CF10B (Fla. 17th Cir. Ct. order filed May 25, 2001) (posthearing order). Armstrong now appeals the postconviction court's denial of his rule 3.850 motion. He also petitions this Court for a writ of habeas corpus.

RULE 3.850 APPEAL
In this appeal, Armstrong asserts the postconviction court erred in denying postconviction relief on the basis of numerous claims.[4] We will first address those issues *711 relating solely to the guilt phase of Armstrong's trial[5] and then turn to Armstrong's first issue, alleging entitlement to postconviction relief on the basis of the invalidation of a prior felony conviction that was introduced at his penalty-phase hearing, which we find dispositive of all remaining penalty-phase issues.

Guilt Phase
Armstrong raises three claims relating solely to the guilt phase of his trial, the first of which involves seven subclaims.
In his first guilt-phase claim, Armstrong asserts that the postconviction court erred in summarily denying his claims of ineffective assistance of trial counsel regarding seven aspects of his trial. Under the standard announced in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to prevail on a claim that counsel provided constitutionally ineffective assistance, a defendant must demonstrate specific acts or omissions of counsel that are "so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Second, the defendant must demonstrate prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. This Court's standard of review of a trial court's ruling on an ineffective assistance claim also is two-pronged: (1) appellate courts must defer to trial courts' findings on factual issues but (2) must review de novo ultimate conclusions on the performance and prejudice prongs. Bruno v. State, 807 So.2d 55, 61-62 (Fla.2001).
In his first ineffective assistance subclaim, Armstrong asserts his trial counsel provided ineffective assistance by failing to object to unreliable identification testimony by witness Bobby Norton. The postconviction court summarily denied this claim on the following basis:
The defense developed a consistent theme that witness identification may have been influenced by photographs of Defendant displayed on television and in the newspapers. This theme was also brought out on cross examination of Bobby Norton. However, this Court finds the record reflects that there is no reasonable probability that Norton's identification of the Defendant would have been suppressed had a motion been filed.
Norton was one of five eyewitnesses identifying the Defendant as having been present at Church's Fried Chicken. Norton witnessed the Defendant talking *712 with the night manager ... Kay Allen. Although Norton was initially unsure whether he could identify the Defendant, Norton was able to pick the Defendant out of a photo lineup shortly after the murder. Norton subsequently made an in-court identification of the Defendant. The jury was well aware of Norton's initial uncertainty. All relevant facts necessary to assess the credibility of Norton were presented. Using the [Strickland] standard ... this Court finds that the outcome of the case would not have been different had [Armstrong's counsel] objected to the identification made of the Defendant by Norton. This claim is without merit.
Prehearing order at 4-5. We find no error in this conclusion. Given that Norton's identification was tested on cross-examination, four other eyewitnesses placed Armstrong at the scene, and Armstrong conceded in closing argument that he was present, Armstrong failed to sufficiently allege prejudice under Strickland.
In his second subclaim, Armstrong asserts that his trial counsel provided ineffective assistance by failing to invoke the Rule of Sequestration until after some State witnesses had already testified. The postconviction court summarily denied this claim, concluding that it was legally insufficient as pled. We find no error in this conclusion, as Armstrong made the mere conclusory allegation that prejudice resulted from the witnesses' opportunity to listen to each other's testimony without any degree of specificity as to what facts were testified to prior to invocation of the rule and without any allegation that certain witnesses' testimonies differed, after hearing other witnesses testify, from their prior statements or depositions. See Freeman v. State, 761 So.2d 1055, 1061 (Fla. 2000) ("The defendant bears the burden of establishing a prima facie case based upon a legally valid claim. Mere conclusory allegations are not sufficient to meet this burden.").
In his third and fourth subclaims, Armstrong asserts that his trial counsel provided ineffective assistance by failing to request a Frye[6] hearing regarding DNA evidence presented through the testimony of George Duncan, a DNA serologist with the Broward Sheriff's Office, and Dr. Martin Tracey, a forensic expert court-appointed to Armstrong's case, and by failing to adequately challenge those witnesses' qualifications as DNA experts. At Armstrong's trial, Duncan and Tracey's consistent findings were that blood taken from the front seat of Armstrong's car matched the murder victim's blood. In summarily denying Armstrong's claims of ineffective assistance regarding DNA testimony, the postconviction court stated:
This claim is conclusively rebutted by the record. A forensic expert was authorized by the court. [Armstrong's counsel] asked for a proffer of the State's DNA evidence and an objection was renewed prior to Dr. Tracey's testimony. Dr. Tracey satisfied the Frye test. He testified that DNA testing has been accepted in the scientific community since the mid-seventies.
George Duncan, the DNA serologist with the Broward Sheriff's Office, testified that he had previously testified as an expert in DNA extraction, but never in DNA profiling. Over [Armstrong's *713 counsel's] objection, the Court qualified Duncan as an expert in DNA profiling. The only blood sample of value was removed from the front seat of the Defendant's car. Duncan found that the sample matched the blood of the deceased victim, Deputy Greeney. This Court finds that the requirements of Frye were met. This Court further agrees with the State that "any refinements or additions to the Frye analysis" which have evolved since the trial, sub judice, cannot be applied in evaluating the effectiveness of trial counsel's performance. [Armstrong's counsel] handled those issues concerning scientific evidence with "such skill and knowledge as will render the trial a reliable adversarial testing process."
Prehearing order at 5-6 (citations omitted). Noting that the DNA evidence was offered solely to show that Greeney's blood was found in Armstrong's vehicle, the postconviction court further concluded that there was no reasonable probability that the outcome of the trial would have been different had the DNA evidence been excluded, because the DNA evidence was cumulative.
We agree with the postconviction court that Armstrong failed to sufficiently allege prejudice. The only relevancy of the DNA evidence was the proximity of Greeney to Armstrong and Armstrong's vehicle when Greeney was shot. The record supports the court's conclusion that, absent Duncan and Tracey's DNA testimony, ample other evidence established that Greeney was standing next to Armstrong when he was fatally shot: testimony indicated that Greeney was conducting a "pat down" on Armstrong when the first shots were fired; and ballistics evidence indicated Greeney was shot from close range. See Armstrong, 642 So.2d at 733. We therefore find no error in the summary denial of these claims.[7]
In his fifth and sixth subclaims, Armstrong asserts that his trial counsel provided ineffective assistance by failing to object to improper bolstering of the State witnesses' credibility and by failing to object to the opinion testimony of State witness Detective Kammerer regarding the "Coomassie blue" method of detecting latent fingerprints. The State, however, correctly notes that these issues were presented and argued in Armstrong's postconviction motion as "judicial error" rather than ineffective assistance of trial counsel. For that reason, we agree with the postconviction court that these claims were procedurally barred as they could have been raised on direct appeal as trial error. This Court will only review those claims actually presented to the court below and thus will not consider the modified versions of these claims under ineffective assistance analysis.
In his final subclaim, Armstrong asserts his trial counsel provided ineffective assistance during jury selection by failing to ensure that a reader was present to assist Armstrong, who has dyslexia, and by failing to adequately question *714 or strike juror Deborah Baker. We agree with the postconviction court that Armstrong's claim regarding a reader at voir dire was legally insufficient as pled and factually rebutted by the record. Armstrong failed to explain how a reader would have aided in his ability to consult with his attorney during voir dire. The record also indicates that Armstrong conferred with his counsel on several occasions during voir dire. We also find that Armstrong's claim regarding juror Baker is clearly refuted by the record. Armstrong alleged that the prosecutor's questioning of juror Baker indicated an apparent familiarity with her. However, the voir dire record reveals that the prosecutor did not indicate he knew juror Baker but, rather, that he presupposed what her answers to certain questions would be since he was employing a questioning method designed to condition the jury to follow the requirements of the law rather than to reveal facts of the jurors's lives. The prosecutor engaged in similar questioning of other jurors. Armstrong's contention that additional questioning of Baker "likely" would have revealed a bias is merely a conclusory allegation that is refuted by the record, which indicates Baker, together with the majority of the panel, answered "no" when asked whether anyone knew the prosecutor.
We therefore find no merit to Armstrong's first guilt-phase claims of ineffective assistance of trial counsel.
In his second guilt-phase claim, Armstrong asserts that the postconviction court erred in summarily denying his claim of a Brady[8] violation, in which he asserted that the State had or knew of material exculpatory evidence, in the form of two statements by Officer Ronnie Noriega taken as part of an internal affairs investigation, and failed to provide that evidence to Armstrong. The postconviction court held as follows with regard to this Brady issue:
The alleged exculpatory evidence in this case are statements of Officer Ronnie Noriega, an alleged eyewitness to the crime. As a result of the public records productions, the Defendant received internal affairs records from the Plantation Police Department, Noriega's employer at the time of the crime in issue. These records contained statements by Noriega as to where he was at the time of the shooting at Church's Fried Chicken.
The Defendant contends that Noriega's statements which were given to internal affairs are substantially different from those Noriega gave at trial. The Defendant asserts that the statements given to internal affairs support and corroborate co-defendant Coleman's alleged confession that he (Coleman) shot Deputy Greeney from the restaurant door.
This Court finds that there was no Brady violation. The State did not withhold information regarding Noriega who was listed by the state as a witness and who was deposed by defense counsel. As with the State, the Defendant had equal access to Noreiga. Further, this Court finds that Noriega's statements given to internal affairs do not inculpate Coleman nor do the statements contradict the State's theory.
Prehearing order at 7-8.
We find Armstrong's Brady claim conclusively refuted by the record. Armstrong asserts that he was prejudiced by the fact that he did not receive copies of Noriega's two investigation statements. Importantly, Armstrong bases his prejudice argument on the differences between Noriega's version of events, as told in his *715 investigation statements, and the State's trial theory, rather than any alleged materiality of the fact that an internal affairs investigation was conducted. However, the content of those statements does not materially differ from Noriega's deposition testimony, which was given in the presence of Armstrong's counsel. In both his investigation statements and his deposition, Noriega gave the following statement of events: he was driving near the Church's Fried Chicken restaurant when he heard shots; he then noticed two black men standing next to a car in front of Church's; he looked in another direction and then heard additional shots, which caused him to duck and put on his brakes quickly to prevent an accident; and after his car came to a stop, he again looked toward Church's and no longer saw the two men or their car but did see officers arrive on the scene and run to and then kneel at a place where he assumed a man was down. Because Armstrong's counsel was present at Noriega's deposition, Armstrong was in fact in possession of the same information he would have had if he had received the actual transcripts of Noreiga's investigation statements. Therefore, Armstrong has failed to satisfy the Brady test as he has not shown a reasonable probability[9] that the outcome of the proceedings would have been different had he been in possession of the internal affairs investigation statements by Noriega.
In his third and final guilt-phase claim, Armstrong asserts that the postconviction court erred in summarily denying his claim that because a reader did not assist him during voir dire, Armstrong was rendered effectively absent during a critical stage of the proceedings. As we have already discussed, Armstrong's claim of ineffective assistance of counsel on this point was correctly denied. However, Armstrong also asserts that fundamental error resulted. We conclude that the postconviction court correctly found this claim procedurally barred. This claim could have been raised on direct appeal.
Finding no error in the postconviction court's summary denial of Armstrong's claims relating solely to the guilt phase, we affirm the denial of his motion for postconviction relief as that denial relates to all guilt-phase issues.

Penalty Phase
Regarding the penalty phase of Armstrong's trial, we find that his first issue, alleging entitlement to postconviction relief on the basis of the invalidation of a prior felony conviction that was introduced at his penalty phase, necessitates resentencing before a new jury and thus renders moot all remaining penalty-phase issues.
At Armstrong's penalty phase, the State presented two witnesses to testify regarding Armstrong's 1985 Massachusetts conviction of indecent assault and battery on a child of the age of fourteen. A records custodian for the Massachusetts district court in which the conviction was obtained testified that the offense was a felony and provided a certified copy of the conviction and sentence. The State then called the victim of that crime, who was fourteen at the time of the crime and twenty at the time of Armstrong's trial. She testified that she met Armstrong in Massachusetts, where they both lived at the time, through a close family friend, Angela, to whom Armstrong was married. Regarding the events of the crime, she gave the following testimony:

*716 Q. What happened on January 12th, do you remember what'85do you remember what day of the week that was?
A. It was a Saturday.
Q. Okay. What happened? Tell us what happened.
A. Angela had asked us to come over to her house....
....
A. And we went over to her house Saturday night and I had to go to church for A.J.S., church program and Angela and Lance was to take us, but he didn't want her to go because she was sick because she was pregnant. So he said he will take me.
....
A. He said he would take me. So as we was driving to the church, he asked if I minded if he stopped somewhere so we could talk. So I told him fine. You know, I figured he'd pull off the side of the road or something. But he drove to some park. A park I have never seen before.
....
A. We went to the park. He pulled up in the parking space and we were sitting there and he was talking. I don't know whatit was so long. I don't know what we were talking about. He asked me to get over into the driver's seat. So I got over into the driver's seat and was playing with the wheel like I was driving.
Q. Had you ever driven a car before?
A. No. I was just playing around with the wheel and he just took me by my shoulder and laid me down on the seat and got on top of me and he started moving up and down on me. I was just lying there. I was telling him to stop.
....
A.... And a car came and pulled up beside us and parked like a couple of parking spaces beside us and he kept his head low and I told him to get off me. He told me not to make any noises because he didn't want them to know we were there. And they left after a couple of minutes and then he just got up off of me and reached into the glove compartment and took out some tissue and started wiping himself. I saw this white stuff all over his hand.
Q. Did you ever see anything like that, that white stuff before?
A. No.
Q. Okay.
A. And then he started, tried to lift up my dress. I said what you doing. He said I want to make sure you are okay. I just told him leave me alone and I wanted to go home.
Q. Okay.
A. And then we drove. He drove back to his apartment.
....
Q. Okay. What happened when you got back in the apartment?
A.... So I went and sat on the couch and turned on the TV and started to study my homework.
....
Q. So what happens? You're sitting in the living room. What happens?
A. Then Lance comes in and he sits on the couch across from where I was sitting and he just was asking me about what I was studying, what I was doing. And then he came over to where I was sitting on the couch and I just sat there looking at the TV and then he just grabbed me by my shoulders and pushed me down on the couch and got on top of me and I was about to scream and he told me not to scream. He said you better not scream because Angela's *717 in the other room and you don't want to wake her up because you know she's sick. And I just stayed there not knowing what to do because I was scared because I figured she probably would be upset and if I made any noises
Q. What were you doing while he was on top of you?
A. I was trying to push him off of me and, you know, trying to make some kind of noise but he just kept telling me stop. Don't make any noises. Don't make any noises because she would get upset. Then he just lifted up my night gown and he put his penis in my vagina.
He pushed my panties over the side and put his penis in my vagina and I wanted tostarted to scream a little and he just stopped and he just laid on top of me and I waswhat is he doing and he got up and went over to her room and I ran into the bathroom and locked the door and then he came knocking on the door and I wouldn't leave and then after a while when I thought he was gone, I went into her, Angela's, room and I just went to sleep on the floor.
The victim's testimony then continued regarding how she was upset by these events and eventually told her grandmother what had happened.
In closing penalty-phase arguments, the State urged the jury to find the aggravating circumstance that Armstrong had "previously been convicted of a violent felony" on the basis of Armstrong's two contemporaneous convictions of attempted murder and robbery and this prior Massachusetts conviction. The jury recommended a death sentence, and the trial court based its finding of that aggravating circumstance, in part, on the Massachusetts conviction.
After Armstrong's direct appeal to this Court, he filed a motion for new trial with the Massachusetts court regarding his 1985 conviction. In 1999, that court vacated Armstrong's conviction of indecent assault and battery on a child of the age of fourteen, finding it constitutionally invalid. Therefore, Armstrong asserted in his subsequent 3.850 motion for postconviction relief that he was entitled to a new penalty-phase proceeding. The postconviction court granted an evidentiary hearing on the issue but denied relief, concluding that error under Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), had been shown but was harmless beyond a reasonable doubt in light of an armed robbery conviction obtained against Armstrong after his penalty phase that would be admissible upon resentencing as evidence of another valid, prior violent felony conviction to be considered in lieu of the vacated conviction.
In this appeal, Armstrong asserts, on the basis of Johnson, that the postconviction court erred in denying relief as to this issue. We agree. This Court has previously discussed the Johnson decision:
In Johnson, the petitioner's death sentence was predicated, in part, on a previous conviction which was vacated after the trial and direct appeal. 486 U.S. at 580, 108 S.Ct. 1981. During the sentencing phase of the petitioner's trial, the previous conviction was argued to the jury and used to support Mississippi's prior violent felony aggravating factor. Id. at 581, 108 S.Ct. 1981. The Supreme Court reversed the death sentence, holding that the consideration of a subsequently vacated conviction to support an aggravating factor violates the Eighth Amendment. Id. at 590, 108 S.Ct. 1981.
In reaching this conclusion, the Court reiterated its previous holding that capital sentencing decisions cannot be based *718 on "mere `caprice' or on `factors that are constitutionally impermissible or totally irrelevant to the sentencing process.'" Id. at 585, 108 S.Ct. 1981 (quoting Zant v. Stephens, 462 U.S. 862, 885, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)). The Court stated, "the error here extended beyond the mere invalidation of an aggravating circumstance supported by evidence that was otherwise admissible. Here the jury was allowed to consider evidence that has been revealed to be materially inaccurate." Id. 486 U.S. at 590,108 S.Ct. 1981.
Rivera v. Dugger, 629 So.2d 105, 108 (Fla. 1993). In Armstrong's case, the jury considered, in support of an aggravating factor, evidence of a conviction that has since been revealed to be materially inaccurate as that conviction has been vacated. It is now clear that reliance upon that conviction to support Armstrong's sentence was erroneous under Johnson. Given the nature of the crime underlying the vacated convictiona sexual offense upon a child and the detailed testimony given by the young victim of that crime at Armstrong's penalty phase, we cannot say that the consideration of Armstrong's prior felony conviction of indecent assault and battery on a child of the age of fourteen constituted harmless error beyond a reasonable doubt.

PETITION FOR WRIT OF HABEAS CORPUS
In his petition for a writ of habeas corpus, Armstrong raises four claims.[10] We will address in turn each issue relating solely to the guilt phase of Armstrong's trial.[11] All remaining claims are now moot as we have ordered resentencing before a new jury.
In his first claim, Armstrong alleges ineffective assistance of appellate counsel regarding four aspects of the guilt phase of his trial. We initially note that habeas relief on the basis of appellate counsel's ineffectiveness is limited to those situations where the petitioner establishes, first, that appellate counsel's performance was deficient because the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance; and second, that the petitioner was prejudiced because appellate counsel's deficiency compromised the appellate process to such a degree as to undermine confidence in the correctness of the result. Rutherford v. Moore, 774 So.2d 637, 643 (Fla. 2000). If a legal issue would in all probability have been found to be without merit had counsel raised it on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective. Id.
In his first subclaim, Armstrong asserts that his appellate counsel rendered ineffective assistance by failing to raise on direct appeal the trial court's denial of a motion for change of venue. We find no merit to this argument. First, we note that Armstrong's motion for *719 change of venue was prematurely filed before an attempt to select an impartial jury. The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds in order to try the case solely on the evidence presented in the courtroom. McCaskill v. State, 344 So.2d 1276, 1278 (Fla.1977). Thus, trial courts are encouraged to attempt to impanel a jury before ruling on a motion for change of venue because this provides an opportunity to determine through voir dire whether individuals who have not been seriously infected by the publicity can be found. See Davis v. State, 461 So.2d 67, 69 n. 1 (Fla.1984) (stating motion for change of venue should not be ruled upon prior to jury selection because an impartial jury may be seated if court finds credible the assurances of prospective jurors that they can set aside extrinsic knowledge and decide the case on the evidence); Manning v. State, 378 So.2d 274, 276 (Fla.1979) (approving procedure where ruling on defendant's motion for change of venue is delayed until attempt has been made to select jury). For that same reason, a motion for change of venue should be renewed at the conclusion of jury selection or be considered waived. See Martin v. State, 816 So.2d 187, 188 (Fla. 5th DCA 2002) ("Jury selection issues are deemed waived after acceptance of the jury, unless the objection is renewed, or the jury is accepted subject to an earlier objection."), review dismissed, 835 So.2d 267 (Fla.2002). A review of the record in this case indicates Armstrong did not renew his motion for change of venue upon the selection of the jury and thus did not preserve this issue for appellate review.
Furthermore, the mere fact that jurors were exposed to pretrial publicity is not enough to raise the presumption of unfairness. See Castro v. State, 644 So.2d 987, 990 (Fla.1994). It is sufficient if the juror can lay aside his or her opinion or impression and render a verdict based on the evidence presented in court. See id.; Bundy v. State, 471 So.2d 9, 19 (Fla. 1985). Armstrong acknowledged in his brief to this Court that those jurors who were exposed to pretrial publicity and selected for the jury also stated that they could set aside their pretrial knowledge and feelings about the victims. Therefore, we conclude that there existed insufficient grounds for appellate counsel to successfully argue fundamental error regarding this issue. In the absence of preservation or fundamental error, this issue would have been nonmeritorious on direct appeal.
In his second subclaim, Armstrong asserts that his appellate counsel rendered ineffective assistance by failing to raise on direct appeal the improper qualification of three State witnesses as experts. We find no merit to this claim with regard to two of those witnesses, George Duncan and Dr. Martin Tracey, for the same reasons we found no merit to Armstrong's 3.850 appeal claim that his trial counsel rendered ineffective assistance regarding these witnesses. As to the third witness, Armstrong alleges that Charles Edel was unqualified to testify about "searing" on Deputy Greeney's clothing and that appellate counsel should have appealed the trial court's denial of Armstrong's objection to the admission of his testimony. We disagree. Edel was found to be a firearms operations expert after he testified that he had fired hundreds of different styles of weapons and had been a firearms instructor for approximately eight years, which included the testing of fire weapons "for court presentation *720 to show operability." When asked about the mechanics of a "handgun flame," Edel testified that a flame results from the expulsion of the exploding gunpowder within the casing, that it can go up to twelve inches from a handgun, and that searing results from such flames. Although Edel admitted that he had not attended any school specifically regarding searing, he also testified that he did not believe there was a "searing school" or, as Armstrong's counsel had argued, a "field of searing" separate from the field of firearms operation. Given the entirety of this testimony, it appears clear that Edel was sufficiently qualified to testify in regard to the searing on Greeney's clothing, and appellate counsel was not ineffective for failing to raise this nonmeritorious claim.
In his third subclaim, Armstrong asserts that his appellate counsel rendered ineffective assistance by failing to raise on direct appeal the admission of three photographs of Officer Sallustio's uniform and wounds, specifically State's Exhibits T, Q, and S. However, the record reveals that, of those three exhibits, Armstrong's trial counsel objected only to Exhibit S, arguing that it was both cumulative of other photographs that would "better describe the wound" and inflammatory. We find no merit to Armstrong's claim of ineffective assistance of appellate counsel. If this issue had been raised on direct appeal, appellate counsel would have faced two very high standards of review: (1) fundamental error regarding Exhibits T and Q; and (2) abuse of discretion regarding Exhibit S. On the basis of this record, we do not conclude that Armstrong has demonstrated a reasonable probability that this issue would have been found meritorious and resulted in a reversal of his conviction.
In his fourth and final subclaim, Armstrong asserts that his appellate counsel rendered ineffective assistance by failing to ensure that "critically material depositions and proceedings" were included in the record on appeal. However, Armstrong only specifically cites to the absence of certain strike conferences from the record, stating that answers by some jurors to voir dire questions went unrecorded. The alleged error here is unclear. If the alleged error is the failure to ensure the recording of portions of voir dire strike conferences, then it would be trial counsel error rather than appellate counsel error and not properly raised in this petition. To the extent that Armstrong is alleging that his appellate counsel was ineffective, he would need to show not only that his appellate counsel failed to include available transcripts in the appellate record but also that those portions of the record that were missing were material to a potentially meritorious issue on direct appeal. Armstrong has not shown the former since he has stated that the missing portions went unrecorded, which indicates they were not available for appellate counsel to include in the appellate record. As for the latter, Armstrong alleges that the incomplete record deprived him of a potentially meritorious argument that prospective juror Coffie was struck for cause without proper justification and on the basis of race. Yet, the record indicates that there was a race-neutral reason for striking Coffie, who stated in voir dire that both his brother and his good friend had been arrested by the Broward Sheriff's Office and that he himself had been harassed in his neighborhood by Broward Sheriff's officers three or four times. The victims of Armstrong's crimes were Broward Sheriff's officers. Thus, the allegedly incomplete record did not deprive Armstrong of a potentially meritorious argument.
We therefore find no merit to Armstrong's first habeas claim of ineffective assistance of appellate counsel.
*721 A second habeas claim that relates solely to the guilt phase of Armstrong's trial is closely related to his last ineffective assistance of appellate counsel subclaim. Citing Dobbs v. Zant, 506 U.S. 357, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993), Armstrong asserts that full appellate review of capital cases must be done on the basis of a complete record. As well, citing section 921.141(4), Florida Statutes (1985), Armstrong notes that Florida law requires review of capital cases by this Court "of the entire record." He therefore alleges that he was denied a proper direct appeal due to record omissions and, citing Delap v. State, 350 So.2d 462 (Fla.1977), claims entitlement to habeas relief. However, Armstrong does not allege that this or any other court refused, in violation of its duty, to examine any portion of the record. And, with the exception of voir dire strike conferences, he has failed to specifically allege what "critical depositions and proceedings" were absent from the record or, in the absence of knowing specifics about unrecorded events, how he is even aware that such events went unrecorded. Bare allegations of unrecorded depositions and proceedings are legally insufficient to entitle him to relief. As for the voir dire strike conferences, Armstrong has failed to link a meritorious appellate issue to the allegedly missing record and thus cannot establish that he was prejudiced by its absence. Furthermore, while this Court did require a new trial on the basis of missing record in Delap, the record that was missing in Delap was far more significant than that allegedly missing here. See id. at 463 (record missing transcript of the jury charge conferences, charge to the jury in both the trial and penalty phases, voir dire of the jury, and closing arguments of counsel in both the trial and penalty phases). Therefore, Delap is inapplicable to the present case.
Having found no merit to Armstrong's habeas claims that relate solely to the guilt phase of his trial and having ordered resentencing on the basis of a 3.850 appeal issue, thereby rendering penalty-phase issues moot, we deny the petition for a writ of habeas corpus.

CONCLUSION
We hold that Armstrong is entitled to postconviction relief on the basis of his first claim. Accordingly, we affirm as to all issues relating solely to the guilt phase of Armstrong's trial but vacate the death sentence and remand for resentencing before a new jury on the first-degree murder conviction.
It is so ordered.
WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
WELLS, J., concurs with an opinion, in which CANTERO and BELL, JJ., concur.
ANSTEAD, C.J., concurs specially with an opinion, in which PARIENTE, J., concurs.
WELLS, J., concurring.
I concur fully with the decision in this case. I write only to point out that I believe that the use of term "error" in the admission of the prior conviction is not accurate in the sense that it connotes error by the trial judge in admitting the prior conviction and testimony in respect to it at the time that it was admitted. The trial judge did not err in that admission. I believe a more accurate analysis is that the vacation of the prior conviction has now caused us to conclude that our confidence in the death sentence in this case has been sufficiently undermined that a new penalty phase is required as a matter of law. I join this conclusion because of *722 the extensive testimony admitted during the penalty-phase trial concerning the facts underlying the vacated prior conviction. However, I expressly state my view that not every post-trial reversal of a conviction which is part of an aggravating circumstance is prejudicial. Prejudice in this type of situation requires a case-by-case analysis, as recognized by this Court in the cases which have found the postconviction vacation of a conviction to be harmless error.
CANTERO and BELL, JJ., concur.
ANSTEAD, C.J., specially concurring.
I concur in the majority decision. However, in light of the United States Supreme Court's recent decision in Wiggins v. Smith, ___ U.S. ___, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), I feel compelled to write separately to note my concerns with Armstrong's separate claim of ineffective assistance of counsel for failure to adequately investigate mitigation to be presented in the penalty phase. The U.S. Supreme Court has repeatedly reaffirmed the importance of thorough investigation by defense counsel into mitigating factors to be presented in the penalty phase of capital cases. See, e.g., id. at 2537; Williams v. Taylor, 529 U.S. 362, 394-99, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); Strickland v. Washington, 466 U.S. 668, 690-91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[12]Wiggins contains a detailed explanation of how the standard established for evaluating the performance of counsel set out in the landmark decision in Strickland should be interpreted and applied.
In Wiggins, the Court stressed that defense counsel's investigations "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." Id. at 2537 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), at 93 (1989) (hereinafter 1989 ABA Guidelines)). Referring to ABA Guidelines, the Court noted that among those topics that should be considered for presentation are "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." Id. (citing 1989 ABA Guidelines 11.8.6, at 133). In concluding that defense counsel's investigation was unreasonably deficient, the Court relied heavily on the ABA standards for capital defense, noting that such standards had long been referred to as "guides to determining what is reasonable." Id. (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052).
In Wiggins, collateral counsel's investigation discovered a wealth of mitigation that trial counsel had not presented or investigated. Id. at 2533. The mitigation included in Wiggins'"bleak life history" indicated that he had suffered severe physical and sexual abuse from multiple individuals growing up. Id. Additionally, his mother was a chronic alcoholic who frequently left him and his siblings at home alone for days, forcing them to beg for food and to eat paint chips and garbage. Id. Further, despite the fact that funds were available for retaining a forensic social worker in order to prepare a detailed social history, Wiggins' trial attorneys had *723 not done so. Id. In collateral proceedings, Wiggins' trial counsel defended the lack of investigation or presentation of mitigating evidence, in effect arguing that these decisions were a matter of strategy and that trial counsel "decided to focus their efforts on `retry[ing] the factual case' and disputing Wiggins' direct responsibility for the murder." Id. However, after reflecting on the standards that should guide counsel's actions in investigating mitigation, the Supreme Court concluded that Wiggins' defense team, who had presented none of the extensive mitigation that existed in the case during the penalty phase of the trial, had not performed the level of investigation that would allow them to make a reasonably informed decision not to present such mitigation. Id.
Determining that the decision not to pursue mitigation was made based on a prematurely truncated investigation, the Court stated:
In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [Wiggins' trial counsel] limited the scope of their investigation for strategic reasons, Strickland does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.

Id. at 2538 (citing Strickland, 466 U.S. at 691, 104 S.Ct. 2052). The Court rejected arguments that Wiggins' defense team made a strategic decision based on the limited investigation they had conducted not to introduce mitigation, commenting that "the `strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a post-hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." Id. at 2538. Ultimately, the Supreme Court determined that trial counsel's investigation into Wiggins' background did not meet the professional norms that prevailed at the time of trial, noting that "[d]espite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." Id. at 2537. Hence, Wiggins' "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." Id. at 2538.
In the instant case, similar observations can be made. The 1989 ABA Guidelines that the Supreme Court concluded should have guided counsel's investigation in Wiggins should have provided similar guidance to Armstrong's counsel.[13] These standards underscore not only the importance of defense counsel's investigation into mitigating factors, but also the understanding that often strategy shifts between the penalty and guilt phases of a capital trial. In general, preparation for both the penalty and guilt phases is essential, and counsel should be aware that "the sentencing phase of a death penalty trial is constitutionally different from sentencing proceedings in other criminal cases." 1989 ABA Guidelines 11.8.1, at 123.[14] "If inconsistencies between the guilt/innocence and the *724 penalty phase defenses arise, counsel should seek to minimize them by procedural or substantive tactics." 1989 ABA Guidelines 11.7.1(B), at 115. In conducting the investigation into those individuals who might present testimony at the penalty phase, counsel is required to seek out witnesses who are "familiar with aspects of the client's life history that might affect... possible mitigating reasons for the offense(s), and/or mitigating evidence to show why the client should not be sentenced to death." Id. 11.4.1(D)(3)(B), at 95.[15]
In the instant case, although trial counsel, who had taken one other case to the penalty phase prior to Armstrong's trial, undoubtedly performed some investigation into Armstrong's past and presented some mitigation during the penalty phase, he conceded, and it was clear from the evidentiary hearing, that his investigation had failed to uncover substantial important mitigation regarding Armstrong's family and social history.[16] Nevertheless, trial counsel claimed and the trial court accepted that much of the negative information associated with Armstrong's formative *725 years would have conflicted with trial counsel's strategy to "humanize" Armstrong. Moreover, relying on mental health evaluations done for competency before trial, trial counsel and the court below determined that trial counsel's failure to put on any expert testimony regarding Armstrong's mental health did not amount to a deficient performance.
However, here, as in Wiggins, and even presuming that the pretrial evaluations revealed some mitigation evidence, it is clear that during his investigation trial counsel did not discover mitigation of the same quantity or quality of that which actually existed and was later introduced at the postconviction evidentiary hearing. Hence, it would be difficult to conclude that counsel's knowledge of the available mitigation was sufficient to make an informed strategic choice on these matters. Without having uncovered the information regarding Armstrong's troubled background, any "`strategic choices made after less than complete investigation are reasonable' only to the extent that `reasonable professional judgments support the limitations on investigation.'" Wiggins, ___ U.S. at ___, 123 S.Ct. at 2541 (quoting Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052). In fact, any attempt to distinguish the difference between the limited mitigation presented at Armstrong's penalty phase and that presented at the evidentiary hearing is strikingly similar to the type of post-hoc rationalization that the Supreme Court rejected in Wiggins. Id. at 2538.
Because we are remanding on separate grounds, there is no need to reach the issue of trial counsel's investigation in this case under a Wiggins analysis. However, my hope is that judges and lawyers will heed the message of Wiggins. In order to avoid uneven dispensation of the death sentence, it is essential for counsel to fully investigate the available mitigation so that any decision on whether or not to present such information is made on a reasonable basis.
PARIENTE, J., concurs.
NOTES
[1] See Armstrong, 642 So.2d at 734 n. 2 (listing direct appeal claims).
[2] Armstrong's claims in that motion were as follows: (1) he lacked funding for effective representation; (2) he was denied access to public records; (3) there was a lack of adversarial testing due to ineffective assistance of trial counsel, withholding of exculpatory or impeachment material, newly discovered evidence, and improper trial court rulings; (4) newly discovered evidence existed; (5) his trial counsel was ineffective during voir dire; (6) he had an Ake claim regarding mental health; (7) there was cumulative error; (8) he had ineffective assistance of trial counsel regarding mitigation; (9) he was innocent of first-degree murder; (10) he was innocent of the death penalty; (11) he was absent from a critical stage of the trial; (12) there was improper burden-shifting in the penalty-phase jury instructions; (13) an unconstitutionally vague aggravating factor of avoiding or preventing lawful arrest was considered; (14) an inaccurate, vague, and overly broad instruction was given on the aggravating factor of murder during the commission of a felony; (15) nonstatutory aggravating factors were introduced; (16) the jury was misled regarding a sense of sentencing responsibility; (17) his rights were denied by the rule prohibiting lawyers from interviewing jurors; (18) Florida's death penalty constitutes cruel and unusual punishment; (19) Florida's capital sentencing scheme is arbitrary and capricious; (20) there was prejudicial pretrial publicity and a failure to change venue; (21) inadmissible victim impact evidence was considered; (22) the trial court refused to find or consider mitigating circumstances; (23) there were record omissions that denied him a proper direct appeal; (24) inadequate harmless error analysis was utilized on direct appeal; (25) an invalid prior conviction was used; (26) there was a lack of testing of scientific evidence under Frye v. United States, 293 F. 1013 (D.C.Cir.1923); (27) the jury was misled regarding the instruction that a majority vote was required to recommend life or death; (28) his sentence was predicated upon an automatic aggravating circumstance; (29) jurors were stricken on an impermissible basis; (30) there was a systematic exclusion of eligible prospective jurors by the use of peremptory challenges in violation of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); (31) a sufficient level of intent and participation to warrant imposition of the death penalty did not exist; (32) he is incompetent to be executed; (33) the conviction and sentence were illegally imposed in violation of international law; and (34) he received inadequate notice of a crime due to charges of both premeditated and felony murder.
[3] Huff v. State, 622 So.2d 982, 983 (Fla.1993).
[4] Those claims are: (1) Armstrong's sentence was based on a since-vacated prior felony conviction; (2) trial counsel was ineffective in investigating and presenting mitigation; (3) trial counsel rendered ineffective assistance regarding (a) the failure to challenge in-court identification, (b) the failure to invoke the rule of sequestration, (c) the failure to request a Frye hearing, (d) the failure to adequately challenge the qualifications of State witnesses, (e) the failure to object to improper bolstering of State witnesses, (f) the failure to object to opinion testimony from unqualified witnesses, and (g) jury selection; (4) there was a lack of specific intent to kill, thus rendering the death penalty inappropriate; (5) exculpatory or impeachment material was withheld; (6) there was newly discovered evidence relevant to both guilt and penalty phases; (7) his public records requests were denied; (8) he was innocent of first-degree murder and the death penalty; (9) unconstitutional jury instructions were used in the penalty phase; (10) nonstatutory aggravating circumstances were improperly introduced; (11) he was absent from critical stages of the trial; (12) his conviction and sentence were illegally imposed in violation of international law; (13) Florida's death penalty constitutes cruel and unusual punishment; (14) his rights were denied by the rule prohibiting lawyers from interviewing jurors; (15) he is incompetent to be executed; and (16) cumulative error exists.
[5] Those issues are claims (3)(a)-(g), (5), and (11).
[6] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923). Under Florida law, a Frye hearing is utilized in order to determine if expert scientific opinion is admissible. See Flanagan v. State, 625 So.2d 827, 829 (Fla.1993). Such opinion must be based on techniques that have been "general[ly] accept[ed]" by the relevant community and found to be reliable. Frye, 293 F. at 1014.
[7] We further note the error in Armstrong's assertion that his trial counsel provided ineffective assistance by failing to challenge more specific elements of DNA testing, such as autoradiograms and population substructuring, through a Frye hearing. This trial occurred in 1991, six years prior to this Court's clarification of the Frye test in Brim v. State, 695 So.2d 268 (Fla.1997), that each stage of the DNA process, i.e., the methodology for determining DNA profiles, as well as the statistical calculations used to report the test results, are subject to the Frye test. Armstrong's trial counsel cannot be found ineffective for not demanding the satisfaction of a more complex test than was required by the law at the time of trial.
[8] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[9] A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[10] Armstrong alleges the following: (1) his appellate counsel provided ineffective assistance regarding (a) the failure to appeal the denial of Armstrong's motion for change of venue, (b) the failure to appeal the improper qualification of the State's witnesses as experts, (c) the failure to appeal the admission of certain photographs, (d) the failure to ensure a complete record, and (e) the failure to raise a cumulative-error argument; (2) there was an incorrect harmless error analysis on direct appeal regarding the improper doubling of aggravating circumstances in light of Armstrong's vacated prior felony conviction; (3) he was denied a proper direct appeal due to omissions in the record; and (4) Florida's death penalty scheme is unconstitutional.
[11] Those issues are claims (1)(a)-(d) and (3).
[12] Likewise, this Court has recognized the importance of trial counsel's investigation into mitigating factors and has not hesitated to reverse sentences where such investigations have been deemed deficient and prejudice has resulted. See, e.g., Ragsdale v. State, 798 So.2d 713, 720 (Fla.2001); Rose v. State, 675 So.2d 567, 570-74 (Fla.1996); Stevens v. State, 552 So.2d 1082, 1085-87 (Fla.1989).
[13] The 1989 ABA Guidelines were recently superseded by a February 2003 revision. Nevertheless, the 1989 version of the guidelines provided the prevailing norms at the time of both Wiggins' and Armstrong's trial.
[14] In commentary to guideline 11.8.6, the authors explained that sentencing proceedings in capital cases are a unique area of criminal practice:

Sentencing proceedings in a capital case resemble a separate trial more than they resemble non-capital sentencing proceedings. The Constitutional due process right to present evidence, as well as the right to counsel, to confront the witnesses against the defendant, and to not be placed twice in jeopardy, adhere to capital sentencing proceedings. Experienced criminal counsel familiar with sentencing practices in non-capital cases may not recognize the different form of advocacy required at a death penalty sentencing trial. The evidence to be presented by the defenseindeed, the whole theory of proceedingat the sentencing phase stands outside normal criminal trial practice. Attorneys skilled in narrowing the focus of trial to exclude irrelevant references to the life and character of a client may find themselves unprepared for the sentencing phase of a capital case where the life and character of the client may have to be revealed in detail. The assistance of one or more experts (e.g. social worker, psychologist, psychiatrist, investigator, etc.) may be determinative as to outcome....
(Footnotes omitted.)
[15] In addition to investigating potential lay witnesses, in preparing for the penalty phase counsel should consider retaining "[e]xpert witnesses to provide medical, psychological, sociological or other explanations for the offense(s) for which the client is being sentenced, to give a favorable opinion as to the client's capacity for rehabilitation, etc. and/or to rebut expert testimony presented by the prosecutor." Id. 11.8.3(F)(2), at 129.
[16] It is not necessary to repeat all of the mitigation presented at the evidentiary hearing here, or detail how it differed in quantity or quality from that which was introduced at the penalty phase. Nevertheless, while this case might be distinguished from Wiggins somewhat by the fact that limited mitigation was introduced during the penalty phase, it suffices to say that the evidentiary hearing demonstrated that there was a large amount of mitigation from family members and from expert witnesses that was never uncovered or presented at the penalty phase. The evidence introduced at the evidentiary hearing included but was not limited to the following: (1) that Armstrong suffered from a seizure disorder; (2) that he suffered from extreme poverty while growing up in Jamaica; (3) that he suffered from "pica," an eating disorder frequently seen in abused or neglected children, which caused him to eat lead paint, chicken excrement, and dirt; (4) that the accidental amputation of his fingers in a sugar cane accident led to Armstrong being hospitalized for five months and afterwards he kept his hand hidden to avoid being harassed by other children; (5) that Armstrong was routinely and severely physically abused by his binge-drinking stepfather; (6) that he suffered from a learning disability and was often beaten at school for failing to understand his schoolwork; (7) that Armstrong was living in Jamaica during a time when political and social conditions were marked by extreme violence, and Armstrong experienced these conditions first hand; and (8) that Armstrong was arrested by Jamaican police and was brutally tortured before he was released.