544 So.2d 184 (1989)
Roger Lee CHERRY, Appellant,
v.
STATE of Florida, Appellee.
No. 71341.
Supreme Court of Florida.
April 27, 1989.
Rehearing Denied July 7, 1989.
James B. Gibson, Public Defender, and Larry B. Henderson, Asst. Public Defender, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen., and Pamela D. Cichon, Asst. Atty. Gen., Daytona Beach, for appellee.
BARKETT, Justice.
Roger Lee Cherry appeals his convictions of two counts of first-degree murder, one count of burglary with an assault, and one *185 count of grand theft. He also appeals his sentences, which include imposition of the death penalty for each of the murder counts. We have mandatory jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm Cherry's four convictions, affirm the death sentence as to one victim and vacate as to the other, vacate the noncapital sentences, and remand for resentencing.
Cherry burglarized a small two-bedroom house in DeLand belonging to an elderly couple, Leonard Wayne and Esther Wayne, during the late evening of June 27 or the early morning of June 28, 1986. When their son arrived for a visit about noon on the 28th, he noticed that their car was gone and a door to the house ajar. Upon entering the bedroom, he discovered his parents lying two feet apart on the bedroom floor, dead. Autopsies revealed that Mrs. Wayne died of multiple blows to the head and that Mr. Wayne died of cardiac arrest.
At the trial, the state's chief witness, Lorraine Neloms, testified that Cherry left the apartment which they shared between 11 and 11:30 p.m. on June 27, 1986, explaining that "he needed some money." He returned about an hour later with two or three rifles and a wallet which contained a bank card and a license identifying a man named Wayne. She asked where he had been and he responded that he went inside a house by the armory. The prosecutor then asked:
Q. Did he tell you what happened inside the house?
A: Yeah. When he went in there, the people was awoke and saw him and the lady tried to fight him or something and he hit her and pushed the man and he grabbed his chest and he found their car keys and took their car.
Ms. Neloms further testified that Cherry bled from a cut on his right thumb, which he stated was the result of having cut a line.
Cherry left the apartment twice more that evening. The first time he went to a bank and on his return stated that a card was stuck in the machine. The second time, about fifteen minutes later, he left "to ditch the car he stole."
The following night, Cherry had Ms. Neloms drive by the car he had "ditched." She identified it as a light blue Ford Fairmount. They saw several police officers around the car and did not stop. After returning home, Ms. Neloms then learned of the murders. As she and Cherry watched the eleven o'clock news, television footage showed the car and house by the armory. She described Cherry as acting "[r]eal strange." Ms. Neloms later went to the police and Cherry was arrested.
A Sun Bank supervisor then testified that the automatic teller machine three blocks from the Wayne residence captured a Master Card and a Sun Bank card belonging to the Waynes on June 28, 1986. Bank audit slips revealed that five or six transactions were unsuccessfully attempted between 1:55 and 2 a.m.
Police testimony indicated that the telephone wire outside the house had been cut at the junction box and that blood had been discovered on a piece of discarded paper near the box, on the walkway leading to the back porch, and on at least one of three jalousie panes found in a wooded thicket to the rear of the house. Those panes had been removed from the porch window. Cherry's blood was consistent with the blood found on the paper and the jalousie. Cherry's left palm print was found on the door frame at the entrance to the Waynes' bedroom and his left thumbprint appeared on one of the jalousie panes. However, a hair fragment was collected from the bedroom wardrobe and determined to be dissimilar to Cherry's known hair sample. Cherry was arrested on July 2 at his home, approximately three blocks from the Waynes' house. Police noted at that time that Cherry had a cut on his thumb, which he remarked was the result of having cut the head off a fish.
Finally, evidence was presented that the Waynes' Fairmount had been discovered abandoned in a wooded area within a mile of their house. Inside its locked trunk, police found a metal tray bearing Cherry's left thumbprint. Cherry's blood was consistent with blood identified on a towel recovered from the front seat of the car.
*186 A jury convicted Cherry of the four crimes charged in the indictment. During the penalty phase, the state offered no additional evidence. The defense evidence was limited to a September 10, 1987, psychiatric evaluation by George W. Barnard, M.D.[1] The jury recommended the imposition of the death penalty by a 7-5 vote for the murder of Leonard Wayne and by a 9-3 vote for the murder of Esther Wayne.
The trial judge sentenced Cherry to death on both capital counts in accordance with the jury's recommendation, finding that the aggravating circumstances[2] far outweighed any mitigating circumstances. On the burglary count, he sentenced Cherry to a life term of imprisonment, and on the grand theft count, to a five-year term, with each to run concurrent with the other.
Cherry's challenge to the guilt phase of his trial proceedings is limited to a single grievance. He contends that the trial judge unfairly precluded the testimony of a defense witness who would have impeached Lorraine Neloms. Neloms had previously testified that she had seen Cherry with a wallet which held a license bearing the name "Wayne." Defense counsel attempted to call a licensing official from the Department of Motor Vehicles to establish that Wayne had not been issued a current driver's license since 1970. The prosecutor objected because the witness had not been disclosed in response to the state's discovery demand. Defense counsel explained that he had only learned that morning of the witness and proffered the witness's testimony. Based on the proffer, the trial court did not permit the witness to testify.
Cherry appears to argue that the trial court's decision to exclude the testimony failed to comply with Richardson v. State, 246 So.2d 771 (Fla. 1971).[3] We reject that contention. The record reflects that the trial court conducted an appropriate Richardson inquiry. First, the court inquired into the circumstances of the discovery violation and ascertained what prejudice, if any, the violation caused the nonoffending party. It heard from defense counsel as to the reason for nondisclosure and from the state as to the effect of the breach on the state's ability to prepare for trial. This was the appropriate response.
Subsequent to the Richardson inquiry, defense counsel proffered the testimony of the witness. Thus, the trial judge was called upon to ascertain the evidentiary value of the testimony. Based upon defense counsel's proffer of the witness's testimony, and not upon the occurrence of a discovery breach, the judge ruled the proffered testimony immaterial, for there was no previous testimony that Mr. Wayne carried a current driver's license.[4] We find no error. In areas concerning the admission of evidence, the trial judge's wide discretion will not be disturbed absent an abuse of that discretion. Welty v. State, 402 So.2d 1159, 1162-63 (Fla. 1981).
After reviewing the record, we find the evidence sufficient to sustain the convictions *187 of the four crimes with which Cherry was charged.
Cherry's remaining eight challenges are directed to the penalty phase of his trial. We address two of these challenges and find the remainder meritless. First, Cherry contends that the trial court improperly considered murder for pecuniary gain and murder during the commission of a burglary as separate aggravating factors. We agree and find that the aggravating factor of murder for pecuniary gain was erroneously doubled in this case.
At the outset, we note that doubling of aggravating circumstances is improper where they refer to the "same aspect" of the crime. Provence v. State, 337 So.2d 783, 786 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). The state argues that no impermissible doubling occurred here and urges us to follow Brown v. State, 473 So.2d 1260 (Fla.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985). We find Brown, however, inapplicable to these facts. In Brown, the victim was beaten, raped, and strangled. During her torment, Brown ransacked her home. Under those facts, we found the two factors to be separate characteristics which properly received separate consideration.
In contrast to Brown, there is no question in this case that the sole purpose of Cherry's burglary was pecuniary gain. We find the facts in this case indistinguishable from those in Mills v. State, 476 So.2d 172 (Fla. 1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986). Mills, like Cherry, broke into a home in the early morning intending to find something to steal. When James Wright woke up, Mills fatally shot him with a shotgun. We held that "[t]he aggravating factors that the capital felony was committed in the course of a burglary and that it was committed for pecuniary gain are in this situation both based on the same aspect of the criminal episode and should therefore have been considered as a single aggravating circumstance." Id. at 178 (citations omitted). See also Blanco v. State, 452 So.2d 520, 525 (Fla. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 953 (1985).
Second, Cherry contends that the circumstances of this case do not support the trial court's finding that the murders were "especially wicked, evil, atrocious or cruel."[5] We disagree and find that, as to Mrs. Wayne, the state has demonstrated the existence of this aggravating factor beyond a reasonable doubt.
In Magill v. State, 428 So.2d 649 (Fla.), cert. denied, 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983), we recognized that there is no mechanical litmus test for determining the presence of a section 921.141(5)(h) circumstance. We did, however, establish this standard:
"It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim."
Magill, 428 So.2d at 651 (quoting State v. Dixon, 283 So.2d 1, 9 (Fla. 1973), cert. denied sub nom. Hunter v. Florida, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974)).
The testimony of the district medical examiner indicates that Mrs. Wayne was literally beaten to death. The medical examiner's external observations of Mrs. Wayne revealed multiple areas of contusion around the neck, eyes, lip, the right shoulder and collarbone, and over the left collarbone. A subdural hemorrhage covered *188 most of the brain and was attributed to a forceful blow to the head. The left temporal bone was fractured and the skull dislocated from the spine at its juncture. Those injuries were consistent with trauma caused by her being struck with a fist, hand, or blunt instrument and resulted from at least five blows.
In addition, there was a shoe print on the back of Mrs. Wayne's pajama bottom with a corresponding bruise on her right buttock. The medical examiner concluded that the injuries received by Mrs. Wayne were severe and must have been inflicted with great force. Under these circumstances, the aggravating factor of heinous, atrocious, or cruel is appropriate to the murder of Mrs. Wayne. However, we find this aggravating factor inapplicable to the murder of Mr. Wayne.
Although we have concluded that there was an improper doubling, we are still left with three aggravating factors as to Mrs. Wayne  prior conviction of a violent felony, murder committed for pecuniary gain, and that the murder was especially heinous, atrocious, or cruel. In the absence of any mitigating factors, under these circumstances we affirm the death penalty as to Mrs. Wayne. However, we reverse the death sentence imposed as to Mr. Wayne on the ground that it is disproportionate as applied. We cannot conclude that death is a proportionate punishment when the victim dies of a heart attack during a felony in the absence of any deliberate attempt to cause the heart attack.
Finally, Cherry argues that the trial judge imposed sentence on the noncapital counts without benefit of a guidelines score sheet, thereby disregarding Florida Rule of Criminal Procedure 3.701(d)1 (1988), which requires that a score sheet be utilized for all offenses pending for sentencing. Section 921.001(4)(a), Florida Statutes (1987), provides that the guidelines shall be applied to all noncapital felonies. The state attempts to argue that these were departure sentences and that clear and convincing reasons, although not in writing, can be discerned from the record. This argument was rejected in State v. Jackson, 478 So.2d 1054 (Fla. 1985), where we addressed the necessity for articulating written reasons for guideline departures.
Accordingly, we affirm the four convictions and the death sentence imposed for the murder of Mrs. Wayne. We vacate the sentence imposed for the death of Mr. Wayne and remand for the imposition of a life sentence without eligibility for parole for twenty-five years. We also vacate the sentences for the two noncapital felony counts and remand for resentencing on those counts with instructions that the trial court resentence using a guidelines score sheet.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, SHAW, GRIMES and KOGAN, JJ., concur.
NOTES
[1] Dr. Barnard reported that Cherry's father beat him severely and that his mother had alcohol problems. In the year before his arrest, Cherry smoked marijuana daily and smoked approximately $700 worth of "crack," the last time being on June 28, 1986.
[2] The court found that Cherry had been previously convicted of another felony involving the use and threat of violence, that is robbery; that the murders were committed while he was engaged in the commission of a burglary; that the murders were committed for pecuniary gain; and that the murders were "especially wicked, evil, atrocious or cruel."
[3] The scope of an adequate inquiry requires consideration of all the surrounding circumstances, as the Fifth District recognized in Peterson v. State, 465 So.2d 1349, 1351 (Fla. 5th DCA 1985) ("This inquiry should cover, among other things, such questions as whether the violation is willful or inadvertent, trivial or substantial, and most importantly, what effect, if any, it has upon the ability of the aggrieved party to properly prepare for trial."). After such inquiry, the trial judge may fashion a remedy consistent with the seriousness of the breach. Zeigler v. State, 402 So.2d 365, 372 (Fla. 1981), cert. denied, 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982).
[4] Testimony from Jack Wayne, Leonard Wayne's son, revealed that Leonard Wayne was legally blind and did not drive. He testified that his father did possess a driver's license but he did not know whether it was valid.
[5] This finding substantially conforms to section 921.141(5)(h), Florida Statutes, which defines as an aggravating circumstance a "capital felony [which] was especially heinous, atrocious, or cruel." See Melendez v. State, 498 So.2d 1258, 1261 n. 2 (Fla. 1986), where we noted that an instruction which substituted "wicked, evil" for "heinous" created no reversible error in an instruction.