959 So.2d 702 (2007)
Roger Lee CHERRY, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-2023.
Supreme Court of Florida.
April 12, 2007.
Rehearing Denied June 7, 2007.
*703 Linda McDermott of McClain and McDermott, P.A., Wilton Manors, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL and Kenneth S. Nunnelley, Senior Assistant Attorney General, and Barbara C. Davis, Assistant Attorney General, Daytona Beach, FL, for Appellee.
*704 PER CURIAM.
Roger Lee Cherry appeals an order of the circuit court denying his second motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and an order concluding that he is not mentally retarded under Florida Rule of Criminal Procedure 3.203. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. As explained below, we affirm the circuit court's denial of Cherry's postconviction motion and the order on mental retardation.

I. FACTS AND PROCEDURAL HISTORY
Cherry was convicted of two counts of first-degree murder, one count of burglary with assault, and one count of grand theft following the 1986 murders of Ester and Leonard Wayne. Cherry v. State, 544 So.2d 184, 184-85 (Fla.1989). We affirmed both murder convictions and the death sentence imposed for Ester's murder; however, we reversed the death sentence imposed for Leonard's murder on proportionality grounds. Id. at 186-88. The facts of this case are fully set out in our prior opinion in Cherry's direct appeal. See id. at 185-86.
The circuit court summarily denied each of the claims in Cherry's first motion for postconviction relief. On appeal, we affirmed that denial with respect to most claims but remanded for an evidentiary hearing on Cherry's ineffective assistance of penalty phase counsel claims. Cherry v. State, 659 So.2d 1069, 1074 (Fla.1995). After an evidentiary hearing, the circuit court again denied relief, and we affirmed that denial on appeal. Cherry v. State, 781 So.2d 1040, 1055 (Fla.2000).
On August 7, 1997, Cherry filed a second postconviction motion, raising five claims.[1] The circuit court held a Huff[2] hearing, after which it summarily denied all five of Cherry's claims. State v. Cherry, No. 1986-04473 (Fla. 7th Cir. Ct. order dated Oct. 16, 2001) [hereinafter Postconviction Order I]. Following Cherry's motion for rehearing, the circuit court reversed part of its decision and granted Cherry's motion for an evidentiary hearing to address the claim of newly discovered evidence.
At the hearing on June 10, 2002, Cherry presented the testimony of several witnesses regarding his newly discovered evidence claim, including Levester Hill, one of his childhood friends, who testified that another man, James Terry, confessed to playing a role in the murders. Terry also testified at the hearing, claiming that while he had talked with Hill about Cherry's case, he never said that he played any part in the murder of the Waynes.
After the hearing, the circuit court denied relief on this claim. State v. Cherry, No. 1986-04473 (Fla. 7th Cir. Ct. order dated Aug. 12, 2002) [hereinafter Postconviction Order II]. Cherry appealed the denial of his postconviction motion, raising two issues.[3]
While review of the circuit court's decision was pending before this Court, Cherry *705 filed a third motion for postconviction relief, based on the decisions in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The State filed a motion to relinquish jurisdiction on the basis of this third motion. On November 18, 2004, we relinquished jurisdiction to the circuit court for a determination of mental retardation pursuant to rule 3.203. The circuit court held a hearing on July 25, 2005, at which the defense presented evidence.
Following this hearing, the circuit court found that Cherry did not meet the statutory definition for mental retardation. Cherry v. State, No. 86-4473 (Fla. 7th Cir. Ct. order filed Oct. 14, 2005) [hereinafter Supplemental Order].
On November 2, 2005, we granted leave to Cherry and the State to supplement their initial briefs to this Court on the basis of the circuit court's determination that Cherry is not mentally retarded. Following oral argument on January 5, 2007, we now affirm the circuit court's denial of each of Cherry's claims.

II. ANALYSIS OF ISSUES ON APPEAL

A. Original Postconviction Issues
1. Newly Discovered Evidence
Cherry argues that the circuit court erred in denying his newly discovered evidence claim. Newly discovered evidence must meet two requirements in order for a court to set aside a conviction or death sentence. First, Cherry must show that the evidence could not have been discovered with due diligence at the time of trial. Torres-Arboleda v. Dugger, 636 So.2d 1321, 1324-25 (Fla.1994). Moreover, "any claim of newly discovered evidence in a death penalty case must be brought within one year of the date such evidence was discovered or could have been discovered through the exercise of due diligence." Glock v. Moore, 776 So.2d 243, 251 (Fla.2001). Second, Cherry must show that the evidence would probably produce an acquittal or a lesser sentence on retrial. Jones v. State, 591 So.2d 911, 915 (Fla. 1991). In considering whether this evidence would affect the outcome at the guilt or penalty phase of a trial, courts consider whether the evidence would have been admissible at trial, the purpose for which the evidence would have been admitted, the materiality and relevance of and any inconsistencies in the evidence, and the reason for any delays in the production of the evidence. Jones v. State, 709 So.2d 512, 521-22 (Fla.1998).
In reviewing a circuit court's decision on a postconviction motion, we do not substitute our judgment for that of the circuit court on questions of fact, questions concerning the credibility of the witnesses, or questions of the weight to be given to the evidence so long as those judgments are supported by competent, substantial evidence. Porter v. State, 788 So.2d 917, 923 (Fla.2001).
The evidence at issue that Cherry claims is newly discovered is a confession made by James Terry to Levester Hill that he (Terry) participated in these murders. At the hearing, Cherry submitted Hill's affidavit and called Hill to testify. According to the affidavit, Hill and Terry discussed the crimes three separate times following Cherry's conviction. Hill alleged that immediately after Cherry's conviction and again in 1988, Terry said that Cherry had not committed the crimes for which he was found guilty. Also, in their 1988 conversation, Hill attested that Terry stated that he threw out a pair of shoes because they matched shoe prints at a crime scene. The final time that Hill talked about these *706 crimes with Terry, which is the basis for the instant claim, was in October of 1994. According to Hill, Terry again stated that Cherry did not murder the Waynes. Terry then told Hill that he was at the crime scene and described the events that took place on the night of the murders. Terry told Hill that Mrs. Wayne woke up when Terry entered the house and that she then started screaming. Mr. Wayne entered the room and clutched his chest before falling to the floor.
Terry also told Hill that he had forced Lorraine Neloms to testify against Cherry at trial. Neloms was a key witness for the State, and she testified that Cherry was absent around the time of the murders and that Cherry confessed to her that he had entered a residence near the armory, a struggle had ensued between himself and the residents, and that he had stolen the wallet and car of the residents. Cherry, 544 So.2d at 185. Neloms was Cherry's girlfriend at the time of the murders, and she was also Terry's niece.
This evidence came to the attention of Cherry's counsel on August 9, 1996, when Monica Conklin, an investigator for Capital Collateral Regional Counsel, began researching potential mitigation evidence on Cherry's behalf in preparation for his postconviction proceedings. Since Hill had been close friends with Cherry growing up, Conklin arranged a meeting with Hill. While interviewing him, Conklin discovered that Hill had this information concerning his conversations with Terry about the crime. At that interview, Hill signed an affidavit as to the facts stated above.
Cherry's counsel attempted to introduce the affidavit at Cherry's first postconviction hearing, but since it had not been raised in that motion, the circuit court did not permit its presentation. Cherry's counsel thus filed the second postconviction motion, which is the subject of this appeal, on August 7, 1997.
At the evidentiary hearing, Hill's testimony was substantially similar to the statement in his affidavit. Two discrepancies did emerge, however. At the hearing Hill testified that Terry never specifically stated that he was in the Waynes' house, but Hill assumed that Terry was at the crime scene given Terry's knowledge about the events that night. This testimony is slightly different from the statement in Hill's affidavit that Terry admitted to being at the crime scene. Hill also testified at the hearing that Terry did not state that he made Neloms testify against Cherry, which contradicts a statement from Hill's affidavit.
Terry also testified at the evidentiary hearing. While he admitted to speaking with Hill in 1994 about the murders, he testified that he never said that Cherry did not commit the crime, that he never said he threw away a pair of shoes because they matched prints from a crime scene, and that he had never told Neloms what to testify to at trial. Terry also testified that he was not present at the Waynes' residence on the night of the murders but was on a trip to Apopka with his employers.
The circuit court denied Cherry's claims, holding that this newly discovered evidence was both procedurally barred and lacking in credibility. Postconviction Order II at 3.
a. Due Diligence
Cherry first argues that Terry's alleged confession to Hill was discovered with due diligence. The circuit court rejected this claim, stating:
The actual confession in this case was unknown at the time of trial because it was allegedly made, piecemeal, beginning in 1987, after Defendant was convicted. Although the last "piece" of the *707 alleged confession was made in 1994, it did not come to defense counsel's attention until August 9, 1996, when defense counsel was preparing for the evidentiary hearing to be held in December of 1996, as ordered by the Florida Supreme Court. Defendant has only one (1) year from the date the evidence was discovered or could have been discovered to file a Rule 3.850 Motion. Glock v. Moore, 776 So.2d 243, 251 (Fla.2001); Jones, 591 So.2d at 915-16. Therefore, the Court finds that at the very least, this "newly discovered evidence" could have been discovered, by due diligence, in 1994 and brought to the Court's attention within one year from that date. Thus, the Court finds that Defendant has not successfully demonstrated that the "evidence" is newly discovered. Accordingly, this claim is untimely.
Postconviction Order II at 2-3.
In 1996, when Conklin first spoke to Hill, it was only because Hill was a childhood friend of Cherry, and the investigator was attempting to gather mitigation evidence for Cherry's first postconviction motion. While Cherry's counsel had apparently suspected Terry was involved in the killings, they had no knowledge that Terry and Hill even knew each other, much less that they had spoken about the crimes. Hill offered the information about his conversations with Terry to Conklin on August 9, 1996. Counsel attempted to introduce the affidavit at the first postconviction motion hearing but was not allowed to do so and thus filed the present motion on August 7, 1997, within one year of Hill's interview and affidavit signing.
We have barred evidence under the first prong of the newly discovered evidence rule before, but in those cases, the evidence was of such a nature that there was no reason the defendant could not have discovered it many years before. The evidence in these cases had either been in existence and accessible by the defense years before or was evidence of general, public knowledge. For example, in Glock v. Moore, 776 So.2d 243, 251 (Fla.2001), we held that evidence that traffic stops on the New Jersey Turnpike might have been illegal because of the discriminatory use of racial and drug profiling in 1983 was procedurally barred from being introduced as newly discovered at the postconviction hearing in 2000. The circumstances of the defendant's stop were known by counsel and the use of racial and drug-profiling in traffic stops had been well known for many years, so the evidence was not newly discovered. Id.
Evidence was also procedurally barred in Jones v. State, 591 So.2d 911, 916 (Fla. 1991), because the evidence included the testimony of witnesses at the crime scene who were listed in the police report, and their testimony concerned circumstances that occurred at the time of the murder. When the defendant attempted to resurrect this testimony as newly discovered evidence ten years later, we held that it was procedurally barred because it could have been discovered earlier with due diligence since these witnesses and their statements were found in police records at the time of the crime. Id. We also approved the decision of a postconviction court holding that the defendant had not exercised due diligence because the witness whose testimony was the newly discovered evidence had been interviewed by police at the time of the trial and the witness's name appeared in the police reports. Swafford v. State, 828 So.2d 966, 977 (Fla.2002). Finally, a codefendant's testimony that the defendant was not the ringleader of a gang involved in a murder was procedurally barred because the defendant was aware of the codefendant and could have deposed him at the time of *708 trial. Walton v. State, 847 So.2d 438, 454 (Fla.2003).
We have also found evidence of conversations similar to those in the instant case to not be procedurally barred even though they were first introduced years later. For example, we approved a district court's holding that a claim of newly discovered evidence, statements made in 1989 by the State's key witnesses that they had lied at the defendant's trial, were not procedurally barred in 1996 under the first prong of Jones. Robinson v. State, 770 So.2d 1167, 1170 (Fla.2000). We also affirmed a postconviction order holding a 1980 confession by a codefendant to his cellmate and not presented until a 2001 postconviction motion was not procedurally barred under the first prong of Jones. State v. Mills, 788 So.2d 249, 250 (Fla. 2001). Also, in Jones, though certain evidence was procedurally barred, jailhouse confessions made in 1985 by the alleged actual killer "clearly qualif[ied] as newly discovered evidence" in the defendant's 1991 second postconviction claim. Jones, 591 So.2d at 916. In comparing these cases to the above situations, where we held that testimony and evidence were procedurally barred, our determination as to whether a defendant exercised due diligence tends to turn on whether the testimony and evidence are in the possession of persons with a personal or an on-the-record connection to a case.
In the present case, the confession which is the newly discovered evidence occurred in 1994, was not discovered until August 9, 1996, and was claimed in a motion filed on August 7, 1997. The evidence was not in existence at trial and so could not have been discovered at that time. There was no evidence presented either by the State or Cherry that anyone ever knew of a connection between Hill and Terry or that Terry had spoken about this crime with anyone besides Hill. Hill stated at the hearing that the first person he ever told about these conversations was Conklin in 1996. This evidence is not the testimony of a witness who was either at the crime scene or was known to have any connection to the crime by either defense counsel or the State.
We conclude that the circuit court erred in holding that this evidence was procedurally barred. There is no support for the conclusion that Hill's testimony should have been discovered in 1994. Hill was not connected to any of the events of the crime. Thus, we conclude that Hill's conversations with Terry could not have been discovered with due diligence prior to their actual discovery in 1996.
b. Effect of Newly Discovered Evidence
Even though we find that the evidence is not procedurally barred, we must still determine whether the evidence would probably produce an acquittal or lesser sentence on retrial. Cherry argues that Terry's confession to his presence at the murder would have resulted in at least a life sentence rather than the death penalty, if not an acquittal on the murder charge. The circuit court held that Terry's testimony was more credible than Hill's testimony on key points and also denied the newly discovered evidence claim on its merits. The circuit court's order states:
Moreover, the Court finds that the claim should otherwise be denied on its merits. Mr. Hill's live testimony is inconsistent, albeit slightly, with his affidavit. More importantly, after hearing the testimony of all the witnesses and observing their demeanor, this Court finds that Mr. Hill's testimony is simply not credible, nor worthy of belief. The testimony *709 of Mr. Terry, on the other hand, is more credible on key points.
Postconviction Order II at 3.
We find that the circuit court's conclusion as to the merits of the newly discovered evidence is supported by competent, substantial evidence. In evaluating a circuit court's order, "this Court will not substitute its judgment for that of the trial court on . . . the credibility of the witnesses and the weight to be given to the evidence," provided its order is supported by competent, substantial evidence. Porter, 788 So.2d at 923. We are highly deferential to circuit court determinations of credibility. Archer v. State, 934 So.2d 1187, 1196 (Fla.2006). After our careful review of the record, we conclude that the circuit court's determination on this issue should be affirmed.
In addition, in assessing the weight to be accorded to newly discovered evidence, we consider the evidence in conjunction with all other admissible evidence. Jones, 709 So.2d at 522. Physical evidence introduced at trial confirms that Cherry was at the crime scene. Blood found on window panes at the Waynes' house, on a piece of paper near their cut telephone lines, and on a towel inside the Waynes' stolen car was consistent with Cherry's blood type. Cherry, 544 So.2d at 185. Cherry also had a cut on his thumb at the time of his arrest four days later, which he told police he had received while he was cutting the head off of a fish. Id. Lorraine Neloms testified that when Cherry had returned home the night that the murders took place, Cherry was bleeding from a cut on his thumb and that he told her that the injury was the result of having cut a line. Id. Cherry's palm print was also found on one of the doors inside the home, and his thumb print was found on one of the window panes. Id. This physical evidence, along with Neloms' testimony, served as the State's primary evidence and led to Cherry's conviction and death sentence. Id. Thus, it has not been demonstrated that even had Hill's testimony been presented at trial, Cherry probably would have received a different conviction or sentence. Even if Hill's testimony was wholly credible and believed by the jury, at no point in his statement did he indicate that Terry confessed to committing the murders or that Cherry did not participate in the events that night.
2. Scientific Evidence
Cherry next argues that the population frequency statistics of blood types presented at his trial should have been subject to a Frye[4] analysis, in accordance with this Court's decision in Brim v. State, 695 So.2d 268 (Fla.1997). In Brim, we held that the Frye test was to be applied in determining whether to admit population frequency statistics of DNA. Id. at 271. The circuit court summarily denied this claim, holding that it was procedurally barred and should have been raised at trial or on direct appeal. Postconviction Order I at 433-34.
The relevant trial testimony was that of David Baer, a crime laboratory analyst in the serology section of the Florida Department of Law Enforcement Crime Laboratory. Baer, admitted as an expert on serology, testified that some of the blood found at the crime scene matched Cherry's blood group typing. Baer also calculated while on the stand that Cherry's blood *710 group factor and the six enzymes found in his blood are found in approximately one and nine-tenths percent (1.9%) of the population. While Cherry's counsel argued prior to Baer's testimony at trial that the expert's testimony should be confined to his area of expertise, Cherry did not object when Baer testified as to this population frequency analysis or request a Frye hearing on this testimony. Additionally, Cherry first raised this issue only after his conviction and sentence became final on direct appeal.
Cherry argues that this issue is not procedurally barred because it could not have been raised at trial, on direct appeal, or even in his first postconviction motion because those proceedings all took place before this Court's opinion in Brim was issued in 1997. Thus, Cherry argues that Brim should be applied retroactively and cites to Murray v. State, 692 So.2d 157 (Fla.1997), as an example of such retroactive application.
In Murray, the State offered DNA evidence that was objected to at trial by the defendant on the basis that both the method of DNA testing and the probability calculations used by the State's expert to report the frequency of a match should have been subject to the standards of Frye before they were admitted. Id. at 160. Murray objected to this evidence at the pretrial suppression hearing, but the judge allowed the evidence, holding that the methodology used to analyze the evidence was a weight issue for the jury to consider. Id. at 161. On appeal, we applied Brim in reiterating that both parts of DNA testing and analysis, including the population frequency analysis, are subject to a Frye analysis and held that it was the trial judge's responsibility to determine whether the methods used were proper under Frye. Id.
Cherry argues that because the trial in Murray occurred before the decision in Brim, we retroactively applied Brim when we relied on it in Murray's direct appeal. However, in Murray, we addressed a preserved claim on direct appeal, to which Brim need not have been retroactively applied. Murray simply is not an example of the retroactive application of Brim.
Brim has never been held to apply retroactively. In fact, in Armstrong v. State, 862 So.2d 705 (Fla.2003), an appeal of a postconviction motion, we declined to hold trial counsel ineffective for failing to object to population frequency analysis in the context of DNA testing because the trial in question occurred before Brim was issued. Specifically, we stated:
We further note the error in Armstrong's assertion that his trial counsel provided ineffective assistance by failing to challenge more specific elements of DNA testing, such as autoradiograms and population substructuring, through a Frye hearing. This trial occurred in 1991, six years prior to this Court's clarification of the Frye test in Brim v. State, 695 So.2d 268 (Fla.1997), that each stage of the DNA process, i.e., the methodology for determining DNA profiles, as well as the statistical calculations used to report the test results, are subject to the Frye test. Armstrong's trial counsel cannot be found ineffective for not demanding the satisfaction of a more complex test than was required by the law at the time of trial.
Armstrong, 862 So.2d at 713 n. 7. Our description of Brim as a "clarification of the Frye test" suggests that Brim did not issue a new rule of law to be given retroactive effect. Therefore, we conclude that the circuit court properly denied Cherry's claim that the population frequency analysis should have been subject to a Frye *711 analysis because that claim is procedurally barred.[5]

B. Mental Retardation Claim
Finally, Cherry challenges the circuit court's determination that he is not mentally retarded in accordance with the definition set forth in section 921.137(1), Florida Statutes (2002), which provides:
As used in this section, the term "mental retardation" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning," for the purpose of this section, means performance that is two or more standard deviations from the mean score on a standardized intelligence test authorized by the Department of Children and Family Services. The term "adaptive behavior," for the purpose of this definition, means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.
Thus, Cherry must establish that he has significantly subaverage general intellectual functioning. If significantly subaverage general intellectual functioning is established, Cherry must also establish that this significantly subaverage general intellectual functioning exists with deficits in adaptive behavior. Finally, he must establish that the significantly subaverage general intellectual functioning and deficits in adaptive behavior manifested before the age of eighteen.
The circuit court appointed two expert psychologists to test, examine, and evaluate Cherry for the court's mental retardation determination: Dr. Peter Bursten on behalf of the defense; and Dr. Greg Prichard on behalf of the State. Both Dr. Bursten and Dr. Prichard submitted reports on their findings.
At the July 25, 2005, hearing, the defense first called Dr. Bursten to testify. Dr. Bursten stated that he interviewed Cherry, reviewed a large amount of background information, administered the Wechsler Adult Intelligence Scale, third edition (WAIS-III), and interviewed three people who knew Cherry before the offense. On the WAIS-III test Dr. Bursten administered, Cherry scored a full scale IQ of 72. On cross-examination, Dr. Bursten agreed that the two standard deviations language in the rule would place the mental retardation cutoff score at 70.
The defense then also called Dr. Prichard. Dr. Prichard also administered several tests, although he relied on the WAIS-III test administered by Dr. Bursten for Cherry's IQ score. Both Drs. Bursten and Prichard testified that the standard error of measurement (SEM) should be taken into account in every IQ analysis. Dr. Bursten stated:
The concept of mental retardation is considered to be a range or band of scores, not just one score or a specific cutoff for mental retardation. The idea behind that is there's recognition that no one IQ score is exact or succinct, that there's always some variability and some error built in.
And the Diagnostic and Statistical manual which is what wemeaning the mental health professionalsrely on when arriving at diagnostic hypotheses. That manual guides us to look at IQ scores as being a range rather than absolute. And the manual talks about a *712 score from 65, a band, so to speak, from 65 to 75  and of course, lower than 65  comprising mental retardation.
Several exhibits were also submitted by the defense. Among these exhibits were several presentence investigation reports throughout the defendant's life which included various IQ scores.[6] The defense rested, and the State produced no witnesses at the evidentiary hearing. Following the hearing, the circuit court denied Cherry's motion for a determination of mental retardation. Supplemental Order at 15.
In reviewing mental retardation determinations in previous cases, we have employed the standard of whether competent, substantial evidence supported the circuit court's determination. See Johnston v. State, 31 Fla.L.Weekly S273 (Fla.2006). To the extent that the circuit court decision concerns any questions of law, however, we apply a de novo standard of review.
The fundamental question considered by the circuit court and raised in this appeal is whether the rule and statute provide a strict cutoff of an IQ score of 70 in order to establish significantly subaverage intellectual functioning. Cherry argues that the standard error of plus or minus five points should be taken into account so that the actual cutoff score is 75, in accordance with provisions and rules from the Diagnostic and Statistical Manual of Mental Disorders and the American Association on Mental Retardation. Cherry also argues that because of the SEM, the IQ measurement is more appropriately expressed as a range of scores rather than just one number. Thus, his IQ score should actually be described as within the range of 67 to 77.
However, the circuit court denied this argument, holding:
Neither Rule nor statute reference the standard error measurement or use the word "approximately". The Florida Department of Children and Families, in determining mental retardation for eligibility for developmental services, makes the 70 IQ score a bright-line cutoff. This Court notes, however, that the DSM-IV-TR recognizes IQ is more accurately reported as a range of scores, a position reflected in the staff analysis for (what was ultimately) Fla. Stat. § 921.137. The Legislature had mental retardation definitions from various states before it, some of which unequivocally provided that certain IQ scores created a mere presumption either for or against mental retardation; language the Legislature did not include in the Florida law. Neither did they set the cutoff at 75. This Court declines to perform a blanket change of the clearly stated IQ criteria, however, the +/-5 standard of error is a universally accepted given fact and, as such, should logically be considered, among other evidence, in regard to the factual finding of whether an individual is mentally retarded.
Supplemental Order at 7 (citations and footnotes omitted).
Both section 921.137 and rule 3.203 provide that significantly subaverage general intellectual functioning means "performance that is two or more standard deviations from the mean score on a standardized intelligence test." One standard *713 deviation on the WAIS-III, the IQ test administered in the instant case, is fifteen points, so two standard deviations away from the mean of 100 is an IQ score of 70. As pointed out by the circuit court, the statute does not use the word approximate, nor does it reference the SEM. Thus, the language of the statute and the corresponding rule are clear. We defer to the plain meaning of statutes:
When [a] statute is clear and unambiguous, courts will not look behind the statute's plain language for legislative intent or resort to rules of statutory construction to ascertain intent. See Lee County Elec. Coop., Inc. v. Jacobs, 820 So.2d 297, 303 (Fla.2002). In such instance, the statute's plain and ordinary meaning must control, unless this leads to an unreasonable result or a result clearly contrary to legislative intent. See State v. Burris, 875 So.2d 408, 410 (Fla.2004). When the statutory language is clear, "courts have no occasion to resort to rules of constructionthey must read the statute as written, for to do otherwise would constitute an abrogation of legislative power." Nicoll v. Baker, 668 So.2d 989, 990-91 (Fla.1996).
Daniels v. Fla. Dep't of Health, 898 So.2d 61, 64-5 (Fla.2005). Because the circuit court applied the plain meaning of the statute, it did not err in its conclusion that Cherry failed to meet this first prong.
In Atkins,[7] the Supreme Court recognized that the various sources and research differ on who should be classified as mentally retarded. For this reason, it left to the states the task of setting specific rules in their determination statutes. The Legislature set the IQ cutoff score at two standard deviations from the mean, and this Court has enforced this cutoff:
The evidence in this case shows [the defendant]'s lowest IQ score to be 79. Pursuant to Atkins, . . . a mentally retarded person cannot be executed, and it is up to the states to determine who is "mentally retarded." Under Florida law, one of the criteria to determine if a person is mentally retarded is that he or she has an IQ of 70 or below. See § 916.106(12), Fla. Stat. (2003) (defining retardation as a significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age eighteen, and explaining that "significantly subaverage general intellectual functioning" means performance which is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the department); Cherry v. State, 781 So.2d 1040, 1041 (Fla.2000) (accepting expert testimony that in order to be found retarded, an individual must score 70 or below on standardized intelligence test).
Zack v. State, 911 So.2d 1190, 1201 (Fla. 2005).[8]
*714 Given the language in the statute and our precedent, we conclude that competent, substantial evidence supports the circuit court's determination that Cherry does not meet the first prong of the mental retardation determination. Cherry's IQ score of 72 does not fall within the statutory range for mental retardation, and thus the circuit court's determination that Cherry is not mentally retarded should be affirmed.
Because we find that Cherry does not meet this first prong of the section 921.137(1) criteria, we do not consider the two other prongs of the mental retardation determination. We affirm the circuit court's denial of Cherry's motion for a determination of mental retardation.

III. CONCLUSION
For the reasons stated, we affirm the circuit court's denial of his postconviction motion, and the circuit court's determination that Cherry is not mentally retarded.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The claims raised by Cherry were: (1) he was denied access to important files and records by State agencies and offices; (2) newly discovered evidence would have altered the outcome of his trial; (3) inadmissible, inaccurate scientific evidence was improperly admitted at his trial; (4) execution by electrocution is cruel or unusual punishment or both; and (5) appellate lawyers should not be prohibited from interviewing trial jurors.
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] Cherry raised the following issues on appeal: (1) newly discovered evidence existed, which if introduced at his trial, would have altered the outcome of the trial; and (2) certain scientific evidence was improperly admitted at his trial.
[4] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923). The Frye test requires a judicial determination that the basic underlying principles of and methods used to analyze scientific evidence have been sufficiently tested and accepted by the relevant scientific community. Id. at 1014.
[5] We also note that the evidence in the instant case deals with the population frequency analysis of blood typing, as opposed to the more novel DNA testing at issue in Brim.
[6] The following IQ scores were reported in the exhibits, in addition to the test administered in 2005: 71 on Kent test administered in 1968; 85 on Beta test administered in 1972; 79 on Kent test administered in 1976; 86 on Beta test administered in 1979; 68 on Beta test administered in 1987; 72 on WAIS-R test administered in 1992; and 78 on WAIS-R test administered in 1996.
[7] In Atkins, the Supreme Court noted that "[i]t is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." 536 U.S. at 309 n. 5, 122 S.Ct. 2242. However, the Court concluded, "As was our approach in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, `we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.' Id. at 405, 416-17[, 106 S.Ct. 2595]." Atkins, 536 U.S. at 317, 122 S.Ct. 2242 (alterations in original).
[8] Indeed, another jurisdiction considering a similar claim noted that fourteen of the twenty-six jurisdictions with mental retardation statutes have a cutoff of seventy or two standard deviations below the mean. Bowling v. Commonwealth, 163 S.W.3d 361, 373-74(Ky.) (upholding use of seventy IQ score cutoff), cert. denied, ___ U.S. ___, 126 S.Ct. 652, 163 L.Ed.2d 528 (2005).