PARIENTE, J.,
concurring.
In 1991, the trial judge who sentenced Freddie Lee Hall to death found Hall to be mentally retarded. Yet, in 2010, the same trial judge found the same defendant not to be mentally retarded. What is the reason for this apparent anomaly? The an *712 swer lies in the fact that the trial court in 2010 was applying the statutory definition of mental retardation that acts as a bar to execution, which did not exist in 1991. Between 1991 and 2010, two developments in the law occurred: (1) the Legislature enacted section 921.137(1), Florida Statutes (2001); and (2) the United States Supreme Court decided the case of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
In Atkins, the United States Supreme Court dramatically changed the legal landscape pertaining to mental retardation and death penalty jurisprudence. The Supreme Court held that it was unconstitutional under the Eighth Amendment for a mentally retarded person to be executed, but the Court also left to the states “the task of developing appropriate ways to enforce the constitutional restriction” on the execution of such individuals. Id. at 317, 122 S.Ct. 2242 (quoting Ford v. Wainwright, 477 U.S. 399, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)).
In Florida, our jurisprudence on this issue is constrained by the Legislature’s enactment, as long as the Legislature defines mental retardation within the constitutional parameters of Atkins. As set forth in Cherry v. State, 959 So.2d 702 (2007), the defendant must present evidence of a significant subaverage general intellectual functioning as a threshold for establishing mental retardation. This requirement derives from the language of section 921.137(1), Florida Statutes, which this Court in Cherry interpreted as providing a “strict cutoff of an IQ score of 70 in order to establish significantly subaverage intellectual functioning.” Cherry, 959 So.2d at 712. Based on the legislative definition of mental retardation, the Court rejected the application of the standard error of measurement (SEM) to the IQ score — not because we considered it the better policy but because we were adhering to the plain language of the statute. Id. at 712-14.
Applying both the statutory definition and our precedent in this case, the trial court found that there was not competent, substantial evidence to support a finding of an IQ score at or below 70. An outlier test, which was performed by Dr. Mosman, could not be considered because Dr. Mos-man’s testimony had not been preserved prior to his death.
Nearly twenty years before, in 1991, the trial court resentenced Hall to death and found him to be mentally retarded as a mitigating factor with “unquantifiable” weight. Yet the circumstances in 1991 were different. In 1991, Hall’s evidence went unchallenged, whereas in 2010, there was a true adversarial testing of whether Hall was mentally retarded under Florida’s statutory definition of mental retardation. In contrast to the 2010 postconviction hearing, during Hall’s 1991 resentencing, the State did not contest the evidence Hall presented, but instead relied on its own evidence to establish seven strong aggravators to outweigh the mitigators.
Although the State in 1991 did not contest whether Hall suffered from mental retardation, the trial court noted throughout the sentencing order that it was troubled as to whether the mental health experts presented by the defendant had exaggerated Hall’s inabilities. The trial court made certain statements throughout the sentencing order that questioned whether Hall suffered from mental retardation, including an in-depth discussion as to whether his behavior and abilities were consistent with a person who had mental retardation. The court explained in relevant part as follows:
[Hall’s] behavior at the time of the crimes for which he stands convicted, as well as some of the statements that he *713 made previously ... would belie the fact of his severe psychosis and mental retardation. Nothing of which the experts testified could explain how a psychotic, mentally-retarded, brain-damaged, learning-disabled, speech-impaired person could formulate a plan whereby a car was stolen and a convenience store was robbed. Bear in mind that the facts of this case conclusively showed that Freddie Lee Hall was the one that kidnapped Karol Lea Hurst from the Pantry Pride grocery store. Freddie Lee Hall alone was the one that drove Karol Lee Hurst, in broad daylight, through the city of Leesburg to a spot in the woods some eighteen miles distant. There is no evidence as to whether or not Freddie Lee Hall possessed a driver’s license, but he was certainly driving a car in broad daylight through city traffic with a kidnapped victim inside.... Nothing in the evidence can explain how Freddie Lee Hall could live a more or less normal life, obtain employment, and substantially remain outside of violation of the law during the five (5) years that he was on parole after his first rape conviction. Nothing in the evidence can explain the statements that the defendant made when he testified in his own behalf during his first trial.... In other words, the clinical characterization of the defendant presented by the testimony of the defense experts does not seem to comport with the other evidence of the defendant’s background and behavior that are clear from other aspects of the evidence in this case. Thus, this Court believes that the evidence of the experts, for whatever reason or reasons, is exaggerated to some extent.
When discussing mental retardation, the trial judge found as follows: “There is substantial evidence in the record to support this finding. Again, however, there is difficulty in relating this factor back to determine how it affected the defendant’s state of mind at the time of the crime. The mitigating factors of this fact are thus ‘unquantifiable.’ ” In evaluating the mitigation in conjunction with the aggravation, the court again noted concerns as to whether the evidence showed that Hall was in fact mentally retarded, stating that “the defendant shows more deliberation and planning than that which might be attributed to a typical retarded defendant.”
In 1999, when Hall filed his initial motion for postconviction relief, the trial court again expressed reservations on the issue of mental retardation, stating that Hall “is probably somewhat retarded.” Hall v. State (Hall VIII), 742 So.2d 225, 230 (Fla.1999)(emphasis added). At that time, I joined with Justice Anstead in relying on Justice Barkett’s position that executing mentally retarded individuals is cruel and unusual punishment, a position that later became the holding of the United States Supreme Court in Atkins. Hall VIII, 742 So.2d at 231 (Anstead, J., specially concurring).
When those decisions were rendered in 1991 and 1999, Atkins had not yet established the prohibition on executing mentally retarded individuals as cruel and unusual punishment. A trial court could find that a defendant was mentally retarded without regard to any statutory definition of mental retardation and those findings would serve as mitigation in much the same way as mental illness or brain damage. Therefore, because mental retardation was not a bar to execution, the State would not have had the same interest in controverting the expert testimony if, as occurred here, there was such overwhelming evidence in aggravation. Thus, as it applies to this case, until this current post-conviction proceeding, there was no true *714 adversarial testing on the issue of whether Hall’s mental deficits qualified as mental retardation under a statutory definition that was enacted only after Hall’s direct appeal and prior postconviction proceedings.
I appreciate the views expressed in the dissents written by Justice Labarga and Justice Perry. I echo the sentiment that Justice Labarga highlights in his dissent: “[T]he imposition of an inflexible bright-line cutoff score of 70, even if recognized as often describing the upper range of mild mental retardation, is not in every case an appropriate way to enforce the restriction on execution of the mentally retarded.” Dissenting op. at 27 (Labarga, J.). Unquestionably, clinical definitions of mental retardation recognize the need for application of the SEM and the use of clinical judgment. In fact, the American Psychiatric Association (APA) proposes a revision to the definition of mental retardation that will replace the use of a numerical score for mental retardation and instead refer to an Intellectual Development Disorder (IDD). However, unless this Court were to recede from Cherry, 959 So.2d at 712-13, as reaffirmed in Nixon v. State, 2 So.3d 137, 142-43 (Fla.2009), and more recently in Franqui v. State, 59 So.3d 82, 92-94 (Fla.2011), a plain language interpretation of Florida’s bright-line cutoff score of 70 will remain the rule of law in this state.
Florida, while not unique in its use of a bright-line cutoff score of 70, is not in the majority, although there is no clear national consensus. Among the states around the nation that continue to have the death penalty, ten states have a statutory bright-line rule that do not apply the SEM, including Florida.[4] On the other hand, sixteen states do apply the SEM, including ten states without a statutory bright-line cutoff.[5] At least an additional two states through court decision do not apply the SEM.[6] The application of the SEM to IQ *715 scores in the remaining four states is unclear.[7]
This national survey of the states that have the death penalty illustrates that there is no clear consensus among the states regarding the use of the SEM, but the use of a bright-line cut off in some states versus the use of the SEM in other states indicates that there will be some inconsistency in findings of mental retardation based on the exact same circumstances.
It is certainly of concern that in some states Hall would be mentally retarded by those states’ definitions, while in others, like Florida, the bright-line cutoff requires a contrary finding. Unfortunately, mental retardation, unlike age, is not a fixed objective test, and therefore these variations appear to have been contemplated by the United States Supreme Court when Atkins was decided. For example, the State of Texas, which leads the nation in executions, declined to establish a bright-line IQ cut off for execution without “significantly greater assistance from the legislature.” Ex parte Hearn, 310 S.W.3d 424, 430 (Tex.Crim.App.2010). The Hearn Court stated that any IQ score could actually represent an IQ that is either five points higher or five points lower than the person’s actual IQ after factoring in the SEM. Id. at 428.
At some point in the future, the United States Supreme Court may determine that a bright-line cutoff is unconstitutional because of the risk of executing an individual who is in fact mentally retarded. However, until that time, this Court is not at liberty to deviate from the plain language of section 921.137(f). See Hayes v. State, 750 So.2d 1, 4 (Fla.1999) (“We are not at liberty to add words to statutes that were not placed there by the Legislature.”). Without a change from the Legislature or further direction from the United States Supreme Court, I conclude that the statute adopted by the Legislature and the precedent set forth by this Court require that the trial court’s order finding Hall not to be mentally retarded be affirmed.

. These states are the following: Arkansas (Ark.Code Ann. § 5-4-618(a)(2) (2012)); Delaware (Del.Code Ann. tit. 11, § 4209(d)(3) (2012)); Florida (§ 921.137(1), Fla. Stat. (2012)); Idaho (Idaho Code Ann. § 19-2515A(l)(b) (2012)); Kentucky (Ky.Rev.Stat. Ann. § 532.130(2) (2012)); Maryland (Md. Code Ann., Crim. Law § 2-202(b)(l)(i) (2012)); North Carolina (N.C.Gen.Stat.Ann. § 15A-2005(a)(l) (2012)); Tennessee (Tenn. Code Ann. § 39-13-203(a)(l) (2012)); Virginia (Va.Code Ann. § 19.2-264.3:1.1(A) (2012)); and Washington (Wash. Rev.Code Ann. § 10.95.030(2)(c) (2012)).

. The states that apply the SEM without a statutory bright-line rule are as follows: California, see In re Hawthorne, 35 Cal.4th 40, 24 Cal.Rptr.3d 189, 105 P.3d 552, 557-58 (2005); Georgia, see Stripling v. State, 261 Ga. 1, 401 S.E.2d 500, 504 (1991); Indiana, see Woods v. State, 863 N.E.2d 301, 303-04 (Ind.2007); Mississippi, see Chase v. State, 873 So.2d 1013, 1028 n. 18 (Miss.2004); Missouri, see State v. Johnson, 244 S.W.3d 144, 153 (Mo.2008) (en banc); Nevada, see Ybarra v. State, 247 P.3d 269, 274-76 (Nev.2011), cert. denied, — U.S. -, 132 S.Ct. 1904, 182 L.Ed.2d 776 (2012); Ohio, see State v. Were, 118 Ohio St.3d 448, 890 N.E.2d 263, 293 (2008); Pennsylvania, see Comm. v. Miller, 585 Pa. 144, 153-54, 888 A.2d 624 (Pa.2005); Texas, see Ex parte Hearn, 310 S.W.3d 424, 430 (Tex.Crim.App.2010); and Utah, see State v. Maestas, No. 20080508, 299 P.3d 892, 947, 2012 WL 3176383, at *41 (Utah July 27, 2012).
The states that apply the SEM but include a statutoiy bright-line cut-off are as follows: Arizona, see State v. Grell, 212 Ariz. 516, 135 P.3d 696, 701 (2006); Louisiana, see State v. Dunn, 41 So.3d 454, 470 (La.2010); Nebraska, see State v. Vela, 279 Neb. 94, 777 N.W.2d 266, 304-05 (2010); Oklahoma, see Smith v. State, 245 P.3d 1233, 1237 (Okla.Crim.App.2010); Oregon, see Or.Rev.Stat. Ann. § 427.005(10)(b) (2012); and Tennessee, see Coleman v. State, 341 S.W.3d 221, 245-47 (Tenn.2011).

. These states are: Alabama, see Ex parte Perkins, 851 So.2d 453, 455-56 (Ala.2002); and Kansas, see State v. Backus, 287 P.3d 894, 905 (Kan.2012).

. These states are New Hampshire, South Carolina, South Dakota, and Wyoming.